The next case for argument is United States v. Peralta. Good morning. Nice to see two familiar faces. Speaking for myself personally anyway. Mr. Williams, give us a few minutes while we're letting the courtroom clear. I noticed Vermont when the presider was referring to a Mercedes-Benz case and in the same breath was talking about letting the horse out of the barn. You're on. Thank you, Mr. Williams. Thank you, Your Honor. Mr. Peralta should be allowed to withdraw his guilty plea because his request satisfies the three. Just a really minor question. Sometimes he refers to it as lamb, sometimes Peralta. How does that work, if you know? I was going to ask Mr. Drescher. Okay. It's obviously not important, but I'm — A convention. I've referred to my client as Mr. Peralta. Thank you. Thank you. Because his request satisfied the three factors in Doe, he filed a timely request to withdraw his plea, and he didn't do it for, from what I can see, any strategic or tactical reason. In fact, if he's allowed to withdraw his plea, the 10-year mandatory sentence that Judge Sessions imposed is gone, and he's looking at guideline sentencing numbers that approach 30 years. So this isn't a situation where he's trying to game the system like Mr. Spencer did or Mr. Carr did in the two cases that the government cited. Mr. Williams, let me just ask. Yes. The district court obviously had a hearing, right? Yes. And credited the attorney's testimony, Mr. Allen, that the client didn't tell the attorney immediately, didn't tell the attorney at the PSR interview, but it was approximately 30 days later, right? That was the finding of the court at the hearing. Yes. Okay. So that, he said, slightly favors not giving him his plea back, right? Because there was no evidence that he immediately changed his mind following the plea, correct? Correct. All right. On the issue of innocence, he credited the attorney that your client confessed in the jail that he knew that this was drug money, right? He credited. And obviously we have the sworn testimony of your client at the plea hearing. So that obviously strongly favors not giving him his plea back, right? I don't think so. Why not? And can I explain? Yes. Starting with his attorney's assertion that his client confessed at that August 4th meeting, Mr. Allen was asked by Mr. Drescher at that hearing whether he had explained what conspiracy meant. It was obvious from the change of plea hearing that Mr. Peralta was confused about what conspiracy meant. Did it mean, for example, if I took the money from point A to point B, was I guilty without knowing what the point of the conspiracy was? My impression, you know, I'm not as deeply into this as either of you, obviously. But it's the whole notion of conspiracy, which is hard enough for us to try to get our arms around, when taking this individual and telling them it's a conspiracy, but we're giving you a plea on conspiracy but not aiding and abetting. Talk about a foreign language. It would not be surprising if all of this confused your client, and the confusion in using legal words like that sort of underlies what was going on here. It's just an observation. I think that's correct. And the point I was making is that Mr. Allen is asked, did you, by Mr. Drescher, did you discuss with your client what conspiracy meant? And Mr. Allen said, of course I'm having that discussion with him. I don't think any time he's telling me he had no involvement at all. We certainly discussed the meaning of conspiracy, but he was saying he had no idea that his cousin Diego was engaged in this kind of thing. And unwittingly ---- Let me just take you back. Because on the claim of actual innocence, maybe he didn't fully understand conspiracy, and that obviously was an issue. But whether or not he in fact admitted that he was guilty of the crime, right, in the jail, the lawyer said he ---- this is ---- I'm now reading from the transcript. He had said he had not slept the night before, and he explained that he needed the money, and he was ashamed, and he had seen Diego making money, and he joined into it, and ---- and this is the key part ---- that he knew it was drugs, and that he knew that what he was doing, and he knew what he was doing, and he apologized for having misled me for something less. So he admitted, obviously he was involved with the money being transferred, and he knew it was drugs. So that's by definition a conspiracy, right? So he didn't ---- That's the attorney saying what my client said on August 4th in the jail. Which was credited by the judge. I understand that. But under oath, my client said three times that he did not participate in a conspiracy knowingly.  Here's the question the judge asked him. So essentially, you took packages when Mr. Paredes was out of the country. This is the judge. You were fully aware that that was part of the drug conspiracy, and also that you collected money and moved money around, and your client answered yes. That was after that one-hour break. Right. Where he may have had a discussion about conspiracy law, right? Well, there was no testimony to that because Mr. Allen was asked specifically, did you talk about conspiracy during that meeting, and he said, I don't know. But he admitted the facts that make you guilty of conspiracy. I understand that, Your Honor. But three times in that half-hour between 1130 and noon, Judge Sessions asked my client first, after Mr. Drescher provided the factual basis, is that what happened? No, that's not what happened. Second time, he's asked by Judge Sessions. I know, but the lawyer was explaining what the issue was. It's not that we don't have any idea. The lawyer said this is a ‑‑ he doesn't believe he was involved in distribution, which you can understand a layperson not understanding. I didn't distribute the drugs. I'm not guilty of conspiracy to distribute. I didn't distribute them. So we know that that was the issue, right, from what the lawyer was reporting to the court. Yeah, and he was asked by Judge Sessions on page 93 of the joint appendix, what was your understanding of this arrangement, Mr. Peralta? Like, I wasn't involved literally in any of this. And then he goes on to say, I've been a good citizen. I've never done anything wrong. I regret my cousin ever came to the United States. And then they take another break. There were five breaks in a half an hour. My client told the DEA in that three‑hour interview, I didn't know what was going on. Say that again. I didn't see anywhere at any point that your client said to the judge, I didn't know it was drugs or drug money. He didn't say that at any point. His claim of innocence wasn't, Judge, I didn't know this was drug money. I didn't know it was drugs. It was much more general than that. He said at one point, I don't know how this conspiracy thing works. That was what your client said. So it wasn't, I didn't know this was drugs. I didn't know this was money. Who did he say that to? Where is there anything in the record before the judge or to his lawyer, to anyone else? When he testified in the hearing, he testified to that fact. At the hearing following the motion to withdraw his plea. I know, but the judge did not credit him. I know he didn't credit him. I know he didn't credit him. Mr. Williams, what is it that requires us to say Judge Sessions erred when he didn't credit that testimony? Well, the standard as I understand it is whether someone has a claim of legal innocence. And what Judge Sessions in his written ruling denying the motion ruled is that the court finds that the defendant has not consistently maintained his innocence. And that's not the standard, that you have to be consistent. If you had to consistently maintain your innocence, the court would never allow anyone to withdraw their plea. Ever. Because you've admitted your guilt. You did it under oath. That's it. Goodbye. Have a nice life. But sometimes people, believe it or not, can be coerced by their attorneys into doing something that they may be reluctant to do. I've been involved in thousands of changes of plea. And I know what goes on in those rooms. And sometimes people really don't want to change their plea. And if nothing, it's quite clear from the record that Mr. Peralta didn't want to change his plea. And something happened in that meeting between noon and 1. I suspect it was, look, you might get 10 years from this judge if you change your plea now. But if we go to trial, and if you lose, you're looking at guideline numbers that are up to 30 years. And at that moment, Mr. Peralta got scared and he admitted it. But it was shortly after that that he, knowing what he was looking at, asked the court to withdraw his plea. What was the time lapse? August 14th was the change of plea. The court received a pro se motion on September 20th. Mr. Peralta went from the Essex County Jail in New York to court on the 14th, not knowing what was going to happen because he had already told his attorney he didn't want to take the plea. We know that from the record because they played that audio tape. He's sent to a different jail in St. Albans, to Northwest. And shortly after that, he finds somebody to help him. Some jailhouse lawyer helps him file that pro se motion. And in between the time the motion is filed, he meets with the probation officer on August 21st. And we know from the pre-sentence report that there was no admission, there was never an admission of guilt. And, in fact, the probation officer was told that he did not admit any of the relevant facts. And we think that, at least I do, that he should be given an opportunity to exercise his right to a trial. I know it's time consuming. I know that Mr. Peralta runs a grave, grave risk of a very long prison sentence. It's something that I obviously had to talk to him about before pursuing this appeal. He's been very clear he wants a trial. And, frankly, I think he should get one. Thank you. Thank you. Thank you, Your Honors. You've reserved two minutes for rebuttal, Mr. Williams. Okay. Thank you. Good morning. May it please the Court. As Your Honors' questions pointed out, this appeal is fundamentally about Judge Sessions' credibility assessment. Judge Sessions was careful at the change of plea hearing. He carefully considered the motion to withdraw the guilty plea. He took the probably unnecessary step of holding evidentiary hearings on that motion to withdraw. He had an opportunity to assess Defendant Mr. Lamb's demeanor and admissions at the change of plea. He saw Mr. Lamb get examined and cross-examined. He heard testimony from Mr. Lamb's attorney contradicting in substantial parts what Mr. Lamb claimed to have happened. That, it being a credibility determination, it is subject to a very deferential standard of review by this Court. That being the case, we think the record would be ample for this Court to affirm. Did Judge Sessions apply the wrong standard, Mr. Drescher? He did not. He applied the exact right standard. He assessed the three frequently articulated factors. The most significant of one, I would suggest, is whether there was a legitimate or serious claim of innocence by the defendant seeking to withdraw his plea. This Court has made clear, I'd point out the River-Nyder case in particular, a district court does not abuse its discretion in discrediting a later inconsistent claim of innocence as compared to the sworn admissions at a change of plea colloquy. For that reason, I think the district court could have denied the motion without holding a hearing. But once he took the hearing, once he held the hearing and had a second opportunity to assess Mr. Lamb's credibility and to weigh that against the testimony of his attorney recounting Mr. Lamb's previous admissions of guilt to him, the Court had every reason to conclude that this plea was neither coerced nor the plea of somebody who was trying to assert innocence. The — with regard to Your Honor's question about the last name, Judge Sack, it's my understanding that Lamb-Peralta, one is the last name of a father, one is the last name of a mother, and that the convention is to refer to Mr. Lamb as his first name. Kennedy. I just knew that both names were used from time to time. Now that you mention that, of course, I've seen that before. Thank you. The — and I would like to respond briefly to a point you raised, Judge Sack, with regard to whether conspiracy can be confusing. I would suggest in this context the record is clear that Mr. Lamb was not happy to have been caught being a member of a conspiracy. But the elements of conspiracy are — are not very complicated. It is simply the agreement to — They're not easy for me, but perhaps for Mr. Lamb, yes. And while they certainly weren't easy for Mr. Lamb, having been caught in the middle of one, but as Judge — as Judge Sessions explained to him at the change of plea colloquy, the elements of a conspiracy were an agreement to engage in an unlawful act. And in this case, that agreement was the — the purpose of the agreement was the distribution of more than a kilogram of heroin. And for somebody who might have misconceived what is required to break the drug laws, that might be an uncomfortable situation to be in. This Court has made clear in — in the Doe decision and the Junkall decision that there is no legal requirement that a decision to plead guilty be an easy one. And the fact that Mr. Lamb was not happy about pleading guilty does not indicate that he was pleading as a result of coercion. So in the briefs, there were text messages and photos of the packages between him and one of the co-conspirators. Is that accurate or — That is accurate, yes. Photos of what packages? So the — the nature of the conspiracy was the heroin was shipped into southern Vermont, into Manchester, Vermont, from Guatemala, in a series of DHL shipments that started in the summer of 2015. That when — when Mr. Lamb's co-conspirator was in Vermont, according to Mr. Lamb's admissions, it was Diego Mejia-Paredes, the co-conspirator, who sort of took custody of those and was in charge of distributing and arranging the money. Mr. Mejia-Paredes left the United States in August, and after he left, there were a series of packages that came in in September leading up to the final package that was intercepted in October. The package — the shipments that arrived in September, all of which were — were the subject of the text messages that Your Honor is asking about. The text messages showed that Mejia-Paredes, while he was in Guatemala, was directing Mejia as to how to inspect the packages, how to photograph the packages, where to take the packages, what to — what to give and what to receive, how to conduct himself around the people that he was traveling to southern New England to engage in business with. That was the evidence that the — that had come into the government's hands as a result of forensic advances as we were heading towards trial and that was produced promptly when we received it. Is there anything in the record about Mr. Lamb's fluency in English? I mean, I have no reason to doubt that he's perfectly — I just don't know. The record is that he had several hearings in court. He had his initial appearance. He had a detention hearing. He had a hearing before the district court on an appeal from the detention order. He had a hearing on the press's post-arrest statement. He had the change of plea hearing. He had two separate hearings with regard to the evidentiary — the evidentiary hearing relating to his motion to withdraw the plea. At no point was there a suggestion that Mr. Lamb did not understand what was happening and having had the opportunity to — Linguistically. Linguistically. He — that he understood the language. He was — Judge Sessions saw him be examined and cross-examined in the English language. And so the answer to Your Honor's question, which I shouldn't have said, is no. I believe he's a native of Guatemala. He's not a United States citizen. You've answered — actually, you've answered what I want to know. He was not a Native American speaker, but from everything in the record, it would appear that he spoke the language fluently. That is correct. Okay. Unless the Court has additional questions, which I'd be happy to try and answer, I will sit down the rest of my brief. Yes, sir. Scalia. Well, let me — let me just ask you, because I've sort of been pondering whether it's just a yes-no or a — is the determination that the plea was not voluntary? I know there hasn't been one. Would that have to be a determination that his attorney, Mr. Allen, essentially coerced him into making that — taking the plea? That is Mr. Lamb's argument. That is exactly Mr. Lamb's argument. And Mr. — Mr. Allen testified, the attorney testified, that he was pessimistic about the prospects on trial. He communicated the sentencing that he — that the plea agreement offered a sentencing risk mitigator and was very candid in — in his view of the case to Mr. Lamb. This Court's made clear, I believe, in the — not only the Doe case, but the Junkol case, that a pessimistic, you know, advice of an attorney that the defendant doesn't want to hear does not constitute coercion. But you don't — you don't have to have — he could have gotten his plea back even in the absence of coercion. In other words, if he changed his mind the next day and was claiming actual innocence and there would be no prejudice to the government if it was a day later, really, you could — you don't — in other words, you don't have to have coercion in order for him to be able to get his plea back. Well, I — the factors would certainly be different in that circumstance. And I'm glad, you know, as an advocate, I'm not trying to — I'm not trying to defend that appeal. But I can certainly imagine scenarios if, for example, the plea happens in the middle of the trial, where the — the need and the policy reasons behind the need for finality and predictability of changes of plea would still factor against letting somebody out of a plea, even if he declared he changed his mind the next day. In this case, the record, the factual finding, is that he took about 30 days before he changed his mind. And my question, the one that I just asked you, was aimed at whether in this case sort of the argument is — is only that as to voluntariness, it was — it was coerced by the attorney, by his — by his former attorney. That's my understanding. He doesn't — there's no argument that Judge Sessions was trying to pressure him in. Judge Sessions — No. But — but — but Judge Sessions in making his determination following the evidentiary hearing was essentially it was either, as to voluntariness, it was not something coerced by Attorney Allen. That's — that is my reading of the judge's decision. That is — that is correct. Mr. Williams obviously will speak to that, if he wishes. And the change of plea colloquy is notable for the — the deliberate, careful nature that Judge Sessions — in the manner in which Judge Sessions proceeded. He — Mr. — my friend, Mr. Williams, suggests that the breaks in the proceeding should factor in favor of being — his client being allowed to get out of his plea. I argue the complete opposite, that Mr. — Mr. Lamb had every opportunity to have the benefit of consultation with his attorney. They took a 40-minute break in the middle of the hearing. And even in the — when he was on — when he was cross-examined at the — in March of 2018 on the motion to withdraw, Mr. Lamb himself admitted he understood he didn't have to plead guilty, and he had every opportunity to let the judge know he didn't want to plead guilty. And the record itself makes clear that Mr. Lamb demonstrated a capacity to speak back not only to the judge, but to the factual proffer that I had — that I had offered in court. He was able to stand up for himself in that hearing. And after given every opportunity, and after he was advised of every right that he was waiving, he made a conscious, deliberate, voluntary decision to plead guilty, one that he's not happy about, but it was neither coerced nor the guilty plea of an innocent man. Thank you. Thank you, Mr. Drescher. Mr. Williams. All right. Just briefly, this case, unlike every other case I read about, presents an incredibly difficult change of plea, but prefaced by the fact that my client didn't want to plead before. He was taken to court by surprise. Remember, that hearing was rescheduled from August 21st to August 14th. He's taken directly from jail to the court. He's got a few minutes to confer with counsel. He actually tells the judge, no, I literally had nothing to do with this. But he sincerely believes that he did not knowingly participate in this conspiracy. And I think his sincere belief is borne out by the fact that we're here today, knowing that a 10-year sentence is probably inconceivable if he's convicted after trial. At the hearing, was he asked about the text messages and the photos at the hearing? Yes, he was. What was his response to that? His response was that they, that they, he agreed that that's what was said, but he testified that it wasn't talk about drugs. About Mr. Allen, by the way, Mr. Allen told the court incorrectly that he had received translations of those text messages by August 4th. Those text messages weren't certified until September 20th. So his testimony is somewhat suspect, but be that as it may, knowing that he's facing an incredibly long prison sentence, Mr. Peralta authorized me to file this brief and to be here today and ask the court permission to allow him to withdraw his guilty plea. Thank you. Thank you, Mr. Williams. Thank you very much. Thank you for taking this on. Thank you both for your arguments. We'll reserve decision.